UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEVEN COEQUYT,                                    Case No. 20-CV-1178 (PJS/TNL)

                    Plaintiff,

v.                                                              ORDER

ERIC HOLIEN and CHRIS SALVATI,
acting in their individual capacities,

                    Defendants.

> Greta A. Wiessner, Robert Bennett, Kathryn H. Bennett, and Andrew J.
> Noel, ROBINS KAPLAN LLP, for plaintiff.
>
> Kaylin C. Schmidt and Mark A. Solheim, LARSON KING, LLP, for
> defendant Eric Holien.
>
> Stephanie A. Angolkar, Jason M. Hiveley, and Aaron M. Bostrom, IVERSON
> REUVERS, for defendant Chris Salvati.

Plaintiff Steven Coequyt is an incomplete paraplegic who uses a wheelchair. On
the evening of April 28, 2018, Coequyt was working as a disc jockey ("D.J.") at a
wedding reception at the Jackpot Junction Casino Hotel in Morton, Minnesota. Shortly
after midnight, the Casino called the police for assistance in handling Coequyt because
he had become intoxicated and unruly.

Defendant Officer Eric Holien of the Lower Sioux Tribal Police Department was
dispatched to the Casino and, after talking to Coequyt and Casino staff, Holien arrested
Coequyt for disorderly conduct. Holien then transported Coequyt to the Redwood

County Law Enforcement Center ("LEC"), leaving Coequyt's wheelchair behind at the Casino.  After arriving at the LEC and learning that the jail did not have a wheelchair available, Holien and defendant Sergeant Chris Salvati of the Redwood Falls Police Department carried Coequyt to a holding cell.  Coequyt alleges that he suffered severe pain and was seriously injured due to the manner in which Holien and Salvati carried him.

Coequyt filed this lawsuit against Holien and Salvati[1] under 42 U.S.C. § 1983, alleging that they deprived him of his clearly established right to be free from excessive force under the Fourth and Fourteenth Amendments when they carried him to the holding cell.  This matter is before the Court on the parties' cross-motions for summary judgment.  Holien and Salvati argue that they are entitled to summary judgment on the basis of qualified immunity, while Coequyt argues that he is entitled to partial summary judgment on the issue of liability.  For the reasons explained below, the Court denies all of the motions.

---

[1]Coequyt's complaint also named the City of Redwood Falls as a defendant, ECF No. 1, but the parties stipulated to dismissal of the claims against the City.  ECF Nos. 31, 62.

# I. BACKGROUND

## A. *Coequyt's Disability*

Coequyt has been an incomplete paraplegic since he was seriously injured in a motorcycle accident at the age of fifteen. Coequyt Depo. at 40[2] [ECF No. 45-1]. His legs are mostly paralyzed, but he has "some use of" his adductors, quadriceps, and hamstrings. *Id.* at 80. Coequyt is able to ambulate short distances with assistive devices. *Id.* at 80, 130. Mostly, though, he uses crutches or a wheelchair to get around. *Id.*

## B. *The Casino*

On the evening of April 28, 2018, Coequyt was acting as a D.J. at a wedding reception. The wedding was held at the Jackpot Junction Casino Hotel ("the Casino"), which is located in Redwood County, Minnesota, within the boundaries of the Lower Sioux Reservation. Coequyt Depo. at 67. After the wedding ceremony ended, Coequyt started drinking, and he eventually became extremely intoxicated. *Id.* at 72–73; Holien Incident Rep. ("Holien Rep.") at 2 [ECF No. 45-3 at 3]. Shortly after midnight on April 29, Casino staff called the Lower Sioux Tribal Police Department to seek help in dealing with Coequyt because he was very drunk and acting belligerently; in the words of a Casino staff member, Coequyt was acting "bat-shit crazy." Hirichs Incident Rep.

---

[2]Citations to documents in the record use the native pagination of the documents unless otherwise noted.

("Hirichs Rep.") at 2 [ECF No. 45-4]; Holien Rep. at 2; Holien Body-worn Camera

("BWC") at 1:30–1:59.

In response to the Casino's call, Holien, a tribal police officer, arrived at the

Casino at 12:38 a.m.  Holien Rep. at 2.  A supervisor on duty (Christopher Hirichs) met

Holien on the Casino floor and told him that Coequyt was very intoxicated, had gone

down an escalator in his wheelchair, and had gotten extremely upset when Casino staff

tried to help him get back into his wheelchair.  Hirichs indicated that the Casino was

concerned about leaving Coequyt in his hotel room alone, given his extreme

intoxication, which is why the Casino called the police.  Hirichs Rep. at 2; BWC at

1:14–1:59.

Holien approached Coequyt and asked him what was happening.  Coequyt

responded that he just wanted to go to his room, and he began to wheel away from

Holien across the Casino floor while joking about getting ready to do some gambling.

Holien followed, causing Coequyt to slur, "c'mon, man, you can't restrict me."  Then

Holien grabbed Coequyt's shirt collar to keep him from rolling away, while a Casino

staff member told Holien that Coequyt could not remain on the Casino floor and could

not go to his room alone.  Holien asked Coequyt whether anyone at the Casino was

available to take care of him.  When Coequyt began to drunkenly argue with Holien

instead of answering his question, Holien told Coequyt he was being detained for

-4-

disorderly conduct and began to wheel Coequyt off the Casino floor.  BWC at 2:01–4:10.

Coequyt tried to stop Holien by placing his hands on the wheels of his chair and

dragging his feet on the ground.  *Id*. at 4:10–4:44.  At that point, Holien handcuffed

Coequyt behind his back and told him that he was under arrest.  Immediately Coequyt

told Holien, "you're hurting me," to which Holien responded, "yep."  *Id.* at 4:45–5:20.

After cuffing Coequyt, Holien (accompanied by Casino staff) wheeled Coequyt

to his squad car.  *Id.* at 5:21–7:20.  When they reached the vehicle, Coequyt asked Holien

what he was doing, and Holien informed him that he was going to jail for disorderly

conduct.  *Id* at 7:35–7:42.  Holien asked Coequyt whether he had "limited mobility or

what's the issue?  Or no mobility?"  Coequyt responded, "limited."  *Id.* at 7:48–7:58.

Holien and a Casino staff member then lifted Coequyt out of his wheelchair and

"stuffed" him into Holien's squad car while Coequyt complained and cursed.  Coequyt

Depo. at 80–81 ("I remember being . . . shoved, pushed [into the car]."); Holien Rep. at 2

("Mr Coequyt [sic] legs were crossed the best I could during struggle [sic] and stuffed

into the squad.").  Coequyt did not comply with Holien's instructions, making it

difficult for Holien to get him into the squad car.  BWC at 8:01–9:15.

At one point, Holien's body-worn camera was knocked off his chest when

Coequyt's legs hit him.  *Id.* at 9:08–9:15.  The video captured by the camera does not

clearly show how it was dislodged, but the parties agree that Coequyt's legs came into

contact with Holien's chest.  The parties disagree about whether Coequyt intentionally

kicked Holien.  During his deposition, Holien said that Coequyt kicked him in the chest

"at least twice."  Holien Depo. at 20–21 [ECF No. 45-5].  In the report he created shortly

after the incident, however, Holien referred to Coequyt using his legs to "shove off"

Holien's chest: "Mr. Coequyt then became defensive resistant [sic] by refusing to put

[his] legs in and while I was trying to assist in putting [his] legs in [he] shoved off on

my chest.  During the scuffle at one point the body camera I was wearing was knocked

to the ground off my body."  Holien Rep. at 2.  Coequyt conceded that he was capable

of kicking Holien, but Coequyt does not remember kicking Holien, and he believes his

legs must have spasmed or that his legs accidentally hit Holien's chest when Coequyt

was trying to readjust his position.  Coequyt Depo. at 149 ("If I meant to kick the officer,

I would probably have continued to do so.  I didn't kick—I didn't kick the officer.").

After securing Coequyt in the backseat, Holien attempted to place Coequyt's

wheelchair in the squad car.  Holien learned, though, that he could not fit both Coequyt

and his wheelchair in the backseat, so Holien decided to leave the chair at the Casino.

He told Casino staff that he would "have to come back and get [it]."  BWC at

10:23–11:30.

*C.  The Jail*

Once Coequyt was in the squad car, Holien drove to the Redwood County Law Enforcement Center ("LEC").  Holien called ahead to let the LEC know that he would soon be arriving with a limited-mobility individual, that he had to leave the individual's wheelchair behind, and that he would need help when they arrived at the jail.  *Id.* at 12:15–12:32.

After a mostly silent, eight-minute drive, *id.* at 12:32–20:00, Holien and Coequyt arrived at the LEC, where they were met inside the sally port by Salvati (a sergeant for the Redwood Falls Police Department) and Jordan Cady (a corrections officer for Redwood County).  Holien told Salvati and Cady that he'd had to "stuff" Coequyt into the car because he was rowdy and "being an asshole."  Holien also told Cady that Coequyt would need a wheelchair if one was available, but "[Coequyt's] got limited mobility, so he can do some things on his own."  *Id.* at 20:23–20:47.

Holien then opened the back door of his squad car and told Coequyt to sit up.  Coequyt stared blankly at Holien before indicating that he could not move because his hands were cuffed behind his back.  Holien grabbed the front of Coequyt's shirt and, with the assistance of Salvati, pulled Coequyt out of the car while Coequyt repeatedly yelled "ow!"  *Id.* at 20:51–21:25.

As Coequyt collapsed to the ground outside of the car, Salvati told him, "You're not calling the shots.  You need to stand and walk," and Holien said, "We know you can walk a little bit."  In response, Coequyt yelled, "I can't fucking walk! . . . I got a wheelchair!"  Salvati responded, "Yes you can," and Holien said, "Just 'cause you had a wheelchair, you were still walking."  Coequyt began drunkenly yelling at both officers, while lying on the ground.  *Id.* at 21:23–21:42.  He later testified that he was in a lot of pain due to the handcuffs on his wrists, and it felt like the circulation was being cut off in his hands.  Coequyt Depo. at 141–42.

At that point, Salvati asked Holien whether Coequyt had previously walked, and Holien explained that Coequyt had stood on his own but had not walked.  BWC at 21:42–21:50.  Coequyt continued to lie on the cement floor of the sally port—with his wrists handcuffed behind him, his pants around his thighs, and Holien holding the collar of his shirt—while Holien, Salvati, and Cady discussed how to transport Coequyt to a holding cell.  Coequyt continued to ask about his wheelchair.  Holien responded, "I can't get your damn chair in the car.  So I have to go back and get that once I get done with you."  Coequyt asked, "Are we gonna walk?  You think I'm fucking faking it?," to which Holien responded, "Well, you stood up."  Coequyt denied having stood up and asked Holien to look at the scars on his back from his spinal cord injury for proof of his disability.  *Id.* at 21:50–22:30.

Eventually, Holien and Salvati picked up Coequyt and placed him in a plastic chair while Coequyt continued to yell expletives at the officers and angrily asked if they thought he was faking his disability.  Holien loosened Coequyt's handcuffs while Coequyt wriggled and yelled.  After loosening the cuffs, Holien held on to Coequyt's shirt in order to keep him from falling forward out of the chair.  Even after the handcuffs were loosened, Coequyt begged the officers to take the cuffs off, pleading, "I'm not hurting anyone, I'm not a threat [and] . . . the cuffs really fucking hurt."  Holien, Salvati, and Cady ignored his complaints while they discussed how to move Coequyt out of the sally port and into a cell.  *Id.* at 22:36–27:42.

Salvati asked Cady what options the LEC had available for moving Coequyt to a holding cell, and Cady said that all he had was a restraint chair with wheels (he was unable to find the jail's wheelchair, Cady Depo. at 11–13 [ECF No. 45-7]), but the restraint chair would be a "pain" to use.  Holien explained to Salvati and Cady that they could get Coequyt's wheelchair from the Casino, but they could not use his squad car because the chair would not fit in it.  (Holien was mistaken; after Coequyt was placed in a holding cell, Holien used his car to retrieve the wheelchair from the Casino.  *See* Holien Rep. at 2; Cady Depo. at 41.)  Meanwhile, Coequyt asked the officers—again—to take his handcuffs off because he had "no circulation" and "[could]n't feel [his] hands," but the officers continued to ignore his complaints.  BWC at 27:42–28:49.

Holien, Salvati, and Cady later testified that they had not been worried that Coequyt might escape from their custody.  Holien Depo. at 53; Salvati Depo. at 29 [ECF No. 45-6]; Cady Depo. at 38.  Holien also agreed that there was not any time pressure to get Coequyt booked and into a holding cell.  Holien Depo. at 126.  Still, the officers did not attempt to retrieve Coequyt's wheelchair from the Casino or try to use the jail's restraint chair.  *Id.* at 122–23; Salvati Depo. at 57–60.  Instead, the officers decided that they would carry Coequyt out of the sally port and into a cell, and Salvati called for additional officers to help.  Salvati Depo. at 61; Cady Depo. at 32–33; Holien Depo. at 112; BWC at 28:30–28:55.

While they waited for the additional officers to arrive, Holien told Salvati and Cady, "Just so you're aware, he can use his legs 'cause he kicked me in the chest as I stuffed him in the car."  Coequyt immediately and adamantly disagreed that he had kicked Holien:  "How the fuck did I kick you?  I'm fucking handicapped."  Coequyt asked the officers to release the handcuffs again and continued his drunken rant.  BWC at 28:55–32:00.

When two additional officers arrived at the sally port to assist Holien, Salvati, and Cady, Holien reiterated, "Don't let him fool you that he doesn't have mobility in the legs," and Salvati explained that Coequyt had kicked Holien.  Salvati told the two

newly arrived officers that, although Coequyt used a wheelchair, they were going to

"hoist" him up and carry him to a holding cell.  *Id.* at 32:00–32:45.

The two newly arrived officers then watched as Holien and Salvati grabbed

Coequyt's arms and begin carrying him out of the sally port.  Coequyt immediately

began screaming in pain.  Salvati told him to "start walking."  Coequyt yelled, "I can't

fucking walk!," to which Salvati responded, "Well, we're helping."  Coequyt continued

to scream and moan in pain.  Holien's body-worn-camera footage shows that he and

Salvati held Coequyt near his elbows and forearms—with his arms handcuffed behind

his back and chest parallel to the floor—a technique that appeared to put significant

pressure on Coequyt's wrists.[3]  According to Holien, however, he and Salvati were

performing (or at least were trying to perform) a maneuver called "Position 1," in which

officers use a "figure-four lock" underneath the armpits of the person they are carrying.

Holien Depo. at 110–11.  Even if that is what the officers were attempting to do,

however, the video makes clear that the officers did not have their hands under

Coequyt's armpits, but instead held him near his elbows.  Coequyt began moaning,

"my hands, my hands," but Holien and Salvati did not set him down, readjust their

grips, or do anything else in response to Coequyt's complaints.  Instead, Salvati

---

[3]Defendants' expert agreed that "being lifted by the elbows while handcuffed
does cause compression of the wrist and wrist flexion as seen in the body cam video."
Loyd Expert Rep. ("Loyd Rep.") at 10 [ECF No. 45-12].

repeated his command to Coequyt to "start walking."  BWC at 32:46–33:33; *see also*

Holien Depo. at 97–98, 113–15 (testifying that the way he carried Coequyt would not

have put pressure on his wrists or hands and that he was not able to tell that Coequyt

was in pain during the carry).

 After carrying Coequyt in this position for 45 seconds, Holien and Salvati set

Coequyt down in a holding cell, and Cady removed Coequyt's handcuffs.  At this point,

Coequyt's pants were around his ankles.  As Cady removed the handcuffs, Coequyt

asked, "What did you do to my hands?"  BWC at 33:34–34:15.  Coequyt later testified

that the manner in which he had been carried caused "extreme, excruciating pain" that

he would never forget; Coequyt said that it felt as though his wrists were being ripped

or stretched apart.  Coequyt Depo. at 144, 151.  After leaving Coequyt in the holding

cell, Holien drove back to the Casino and retrieved his wheelchair.  Holien brought the

wheelchair to the LEC before resuming his patrol for the night.  Holien Rep. at 2.

 Throughout the incident, Coequyt was drunk and belligerent, but the officers

agreed that he never physically resisted them at the LEC.  Salvati Depo. at 26–27, 34

(due to his intoxication level, Coequyt was noncompliant with officers' requests to help

them move him to a holding cell, but he did not kick, threaten, or physically resist);

Holien Depo. at 62–63 (only resistance Coequyt offered in the sally port was "passive"

by leaning forward in his chair); Cady Depo. at 25 (Coequyt did not physically resist

himself from being taken into the jail).  Holien believed Coequyt posed a "safety risk" to himself and others because of Coequyt's alleged kick to Holien's chest and "continued verbal noncompliance," Holien Depo. at 53–55, but neither Salvati or Cady believed that Coequyt posed a threat to them, Salvati Depo. at 26, 72; Cady Depo at 23, 28.  Although Coequyt was verbally abusive and combative throughout the night, Holien acknowledged that none of the officers ever ordered Coequyt to stop; instead, the officers "allowed it to continue."  Holien Depo. at 31.

### D.  Coequyt's Injuries

Coequyt did not have a history of wrist or hand problems prior to his encounter with Holien and Salvati.  Coequyt Depo at 105, 111–12; Bert Expert Rep. ("Bert Rep.") at 2 [ECF No. 58-1 at 93].  When he awoke in the LEC on the morning of April 29, however, Coequyt was unable to feel his left hand, and his right hand was swollen and injured.  Coequyt Depo. at 95.  Coequyt testified that he continued to experience numbness, tingling, swelling, and shooting pain for months following the incident.  *Id.* at 92–93, 97–98, 153.

Coequyt did not seek medical attention for his alleged injuries until months later, when he reported wrist pain to his primary-care physician, who referred him to a hand specialist.  *Id.* at 98–99.  Coequyt was diagnosed with carpal-tunnel syndrome in his left wrist in July 2018, ECF No. 51-13 at 6, Coequyt Depo. at 93, and Coequyt underwent

carpal-tunnel-release surgery on November 27, 2018, ECF No. 51-13 at 12.  In August 2019, an MRI revealed that Coequyt had a torn ligament in his right wrist, which was causing him a lot of pain.  *Id.* at 25; Coequyt Depo. at 110–11.  Although he has sought treatment for his right wrist pain and his symptoms have abated, Coequyt says that the pain still "affects [his] everyday living."  Coequyt Depo. at 117.  He believes that his wrist injuries have "severely limit[ed] [his] ability to work" because he has difficulty propelling himself in his wheelchair, lifting, and doing other tasks.  *Id.* at 120–21.

During the course of discovery, Coequyt was evaluated by two independent medical experts, Dr. Jeffrey Husband for the defense and Dr. Jack M. Bert for Coequyt.  *See* Husband Expert Rep. ("Husband Rep.") [ECF No. 45-11]; Bert Rep.  Dr. Husband found that that Coequyt "did not sustain injuries to either wrist during the April 29, 2018 arrest."  Husband Rep. at 12.  By contrast, Dr. Bert found that Coequyt "sustained injuries to both [of his] wrists as a result of his injuries occurring on April 29, 2018."  Bert Rep. at 2.

## II.  ANALYSIS

### A.  Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. *Defendants' Motions*

Holien and Salvati each move the Court for summary judgment, arguing that they are protected from liability by the doctrine of qualified immunity. "Qualified immunity shields government officials from liability in their individual capacity so long as the official has not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Smith v. Conway Cnty.*, 759 F.3d 853, 858 (8th Cir. 2014) (citation, quotation marks, and alterations omitted). The second "asks whether the right in question was clearly established at the time of the violation." *Id.* (citation and quotation marks omitted).

Holien and Salvati argue that they should prevail on both of these prongs:  First, they contend that they did not violate Coequyt's constitutional rights when they carried him from the sally port to the holding cell.  Second, they argue that even if their method of carrying Coequyt *did* violate a constitutional right, that right was not clearly established at the time of the incident.  For the reasons that follow, the Court disagrees.

### 1.  Fourth Amendment Violation

Coequyt alleges that Holien and Salvati used excessive force.  Excessive-force claims brought by arrestees such as Coequyt are analyzed under the Fourth Amendment's "'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).  Evaluating the reasonableness of an officer's use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quotations omitted).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.

While the reasonableness inquiry requires consideration of the "totality of the circumstances," particularly salient factors include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others,

and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

*Id.* at 396; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("Considerations such

as the following may bear on the reasonableness or unreasonableness of the force used:

the relationship between the need for the use of force and the amount of force used; the

extent of the plaintiff's injury; any effort made by the officer to temper or to limit the

amount of force; the severity of the security problem at issue; the threat reasonably

perceived by the officer; and whether the plaintiff was actively resisting.").

If all factual disputes were resolved by a jury in Coequyt's favor, then the Court

would find that Holien and Salvati used excessive force in violation of the Fourth

Amendment when they carried Coequyt in a "chicken-wing" position[4] from the sally

port to the holding cell:

*First*, Coequyt was arrested for a minor, nonviolent crime—disorderly conduct.

Holien Rep. at 2. In fact, he was arrested and taken to jail mostly out of concern for his

own safety due to his level of intoxication. Holien Rep. at 2; Hirichs Rep. at 2; BWC at

1:45–1:55; *cf. MacKintrush v. Pulaski Ctny. Sheriff's Dep't*, 987 F.3d 767, 771 (8th Cir. 2021)

(body slamming a "nonviolent, nonthreatening misdemeanant" constituted excessive

force).

---

[4]The Court borrows the term "'chicken-wing' position" from Coequyt's brief. Pl. Memo. [ECF No. 57] at 11. Based on the video evidence, the Court agrees it is an apt description.

-17-

*Second*, Holien, Salvati, and Cady all agreed that Coequyt was not at risk of escaping, and none of the officers was working under any kind of time constraints.

*Third*, a jury could find that Coequyt never presented a threat—physical or otherwise—to anyone at the LEC. Salvati and Cady testified that they never felt threatened by Coequyt. Holien disagreed, but a jury could conclude that a reasonable officer in Holien's position would not have deemed Coequyt to be a threat. After all, the only bases for Holien's fear were:

> (1) Coequyt's alleged "kick" to his chest while Holien was putting him in the squad car—a kick that Coequyt says was unintentional, Coequyt Depo. at 149–150, that Holien admits did not hurt him, Holien Depo. at 20, and that Holien did not describe as a kick in his incident report, Holien Rep. at 2—and;

> (2) Coequyt's "verbal noncompliance," which Holien admits he did nothing to attempt to stop, Holien Depo. at 31 (the officers "allowed [the verbal noncompliance] to continue").

*Cf. Shannon v. Koehler*, 616 F.3d 855, 862–63 (8th Cir. 2010) (where there were genuine disputes about whether arrestee poked officer in the chest, district court was correct to conclude it was not reasonable for officer to use more than de minimis force against arrestee).

*Fourth*, a jury could find that a reasonable officer in the position of Holien and Salvati would have concluded that Coequyt could not, in fact, support himself while he was being carried through the LEC, which meant that Coequyt could not alleviate the pressure on his wrists.  After all, neither officer ever saw Coequyt walk, nor did either officer have much of a basis for concluding that he could walk.  To the contrary, Holien had been told upon his arrival at the Casino that Coequyt had gone down an escalator in his wheelchair and needed the assistance of Casino staff to get back into his chair. After being wheeled out of the Casino, Coequyt told Holien he had limited mobility, and Coequyt needed the assistance of Holien and a Casino staff member in order to get out of his wheelchair.  Once at the LEC, Coequyt was unable to get out of the squad car without Holien's and Salvati's assistance, and after the officers pulled him out of the car, Coequyt adamantly and repeatedly told Holien and Salvati that he could not walk.

The only evidence either officer had to support a belief that Coequyt could walk was Coequyt's statement that he had "limited" mobility and Holien's subjective belief that Coequyt had intentionally kicked him in the chest.  But in light of the evidence described above, a jury could find that a reasonable officer in the position of Holien and Salvati would not have concluded that Coequyt could walk or support himself.

*Fifth*, a jury could find that a reasonable officer would not have carried Coequyt in the "chicken-wing" position because that position inflicted severe and unnecessary

-19-

pain and because a readily available alternative—holding Coequyt under his armpits (a/k/a "Position 1")—would have worked just as well and caused little or no pain.  It is true that "police officers are often forced to make split-second judgments," *Graham*, 490 U.S. at 397, but that was not the case here.  Holien, Salvati, and Cady spent nearly ten minutes in the sally port deliberating about how to move Coequyt to a holding cell before deciding to carry him in the "chicken-wing" position.  BWC at 24:00–32:45.

The recording from Holien's body-worn camera shows that Coequyt screamed and moaned in pain immediately after Holien and Salvati picked him up, and that Coequyt continued screaming and moaning during nearly the entire time he was being carried.  His cries of pain were markedly more intense than his cries of pain earlier in the night.  Nevertheless, Holien and Salvati ignored Coequyt's pleas and failed to try any of the available alternatives.  They never set Coequyt down so that they could hold him in a less painful manner (such as under his armpits); they never asked for the assistance of the two officers they had called to the scene; they did not attempt to use the restraint chair that Cady told them was available; and they did not retrieve Coequyt's wheelchair from the Casino.[5]  *See Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir.

_____

[5]Holien told the officers that he could not go back and get the wheelchair because it would not fit in his squad car.  A jury could find that a reasonable officer would not have reached that conclusion, given that, after carrying Coequyt to the holding cell, Holien retrieved Coequyt's wheelchair with his squad car.  *See* Holien Rep. at 2; Cady Depo. at 41.  Moreover, the officers apparently never considered asking someone else to

(continued...)

-20-

2014) (available alternatives are relevant to the reasonableness of an officer's use of force).

*Finally*, a jury could conclude, based on Coequyt's expert's testimony, that Holien's and Salvati's treatment of Coequyt caused him to suffer extreme pain and serious injuries to both of his wrists.  *See* Bert Rep. at 2; *Kingsley*, 576 U.S. at 397 ("extent of the plaintiff's injury" is relevant to whether use of force is reasonable).

For these reasons, the Court holds that, if a jury concludes that Coequyt's version of events is true, Holien and Salvati violated Coequyt's constitutional right to be free of excessive force.

## 2.  Clearly Established

The Court now turns to the question of whether, if the jury's findings of fact lead the Court to conclude that Coequyt's constitutional rights were violated, those rights were clearly established in April 2018.

The Court has not found (and the parties have not cited) a case on all fours with this case, but that is not dispositive, as "officers cannot escape suit merely because no prior case involved exactly the same facts as alleged by the plaintiff." *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002)

---

[5](...continued)
retrieve the chair in a different vehicle, or calling the Casino to ask if someone might bring the chair to the LEC (which was just a few minutes away).  Holien Depo. at 122–23.

("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").  "[T]here is no requirement that [the plaintiff] must find a case where the very action in question has previously been held unlawful, so long as existing precedent [has] placed the statutory or constitutional question beyond debate," *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018) (internal citations and quotation marks omitted), and a reasonable officer would be on notice that his conduct violated a constitutional right, *see Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005).

By April 2018, it was clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *see also Wilson v. Lamp*, 901 F.3d 981, 990 (8th Cir. 2018)[6] ("[A]n officer's 'use of force against a suspect who was not threatening and not resisting' is unreasonable." (quoting *Shannon*, 616 F.3d at 864–65)).  Similarly, it was clearly established "that when a person is subdued and restrained with handcuffs, a gratuitous and completely unnecessary act of violence is unreasonable and violates the

---

[6]*Wilson* was not decided until August 2018—four months after the April 2018 encounter between Coequyt and defendants—but *Wilson* relied on a series of cases predating April 2018 in finding that it was "clearly established" that an officer cannot use force against a suspect who is neither threatening nor resisting.  *Wilson*, 901 F.3d at 990-91 (collecting cases).

Fourth Amendment." *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014) (quotation marks and citation omitted).

For instance, in *Blazek,* the Eighth Circuit affirmed the denial of qualified immunity to police officers who "jerked" the handcuffed plaintiff up by his arms with so much force that it caused significant shoulder injury—even though the plaintiff was already detained and "under control," was not resisting, was not suspected of a serious offense, and did not pose a threat to the officers. *Id.* at 925. The court held that "the law was sufficiently developed to show that such a violation [of plaintiff's Fourth Amendment rights]—allegedly involving unnecessary violence against a handcuffed and compliant detainee—would contravene clearly established law . . . ." *Id.* at 926.

The facts of *Blazek* are not identical to the facts of this case, but they are close enough to put Holien and Salvati on notice that their actions (under Coequyt's version of the facts) violated Coequyt's constitutional rights. Like Blazek, Coequyt was handcuffed, was not suspected of a serious offense, and did not pose a threat to anyone at the LEC. And just as the jerking of Blazek's arms with sufficient force to cause injury was unnecessary and gratuitous, so too was the "chicken-wing" carry Holien and Salvati employed on Coequyt. *See also Patzner v. Burkett*, 779 F.2d 1363, 1371 (8th Cir. 1985) (probable cause that plaintiff had committed a misdemeanor did not give officer

"license to ignore . . . [plaintiff's] disability" by dragging him off of chair without asking where his wheelchair or prosthetic legs were).

It was also clearly established by April 2018 that "it is unreasonable to ignore a person's complaints of pain resulting from an officer's use of force."  *Howard*, 570 F.3d at 992.  In *Howard*, police officers held Howard down on an asphalt street for seven to eight minutes while they questioned him and provided first aid for his injuries.  Even though Howard was shirtless, the asphalt was hot, and Howard repeatedly asked to be moved because the asphalt was burning his skin, the officers ignored his requests for several minutes before finally placing a blanket between Howard and the asphalt.  As a result, Howard suffered second-degree burns to his arms, back, shoulders, neck, and upper buttocks.  *Id.* at 987.  Howard sued the officers, alleging excessive force in violation of the Fourth Amendment.  The Eighth Circuit held that the officers were not entitled to qualified immunity because they "unreasonably ignored the complaints of [Howard] that the force applied by [them] was causing more than minor injury."  *Id.* at 991.  "Because case law clearly establishes that [it] is a Fourth Amendment violation to unreasonably ignore a seized person's complaints of pain, the unlawfulness of the Officers' actions was apparent."  *Id.* at 992.

Just as the officers in *Howard* should have known that failing to respond to Howard's complaints about the pain caused by hot asphalt was unreasonable, Holien

and Salvati should have known that failing to respond to Coequyt's complaints about the pain caused by the chicken-wing carry was unreasonable and a violation of the Fourth Amendment.

In sum, if the jury accepts Coequyt's version of the facts, the Court will find that Holien and Salvati are not entitled to qualified immunity.  Defendants' motions for summary judgment are therefore denied.

### C.  Plaintiff's Motion

The Court likewise denies Coequyt's motion for partial summary judgment.  In considering Coequyt's motion, the Court must construe the record in *defendants'* favor to determine "whether, judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifie[d] the use of the force used." *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990).

Coequyt does not dispute that he was extremely intoxicated and acting belligerently throughout the night.  *See* Coequyt Depo. at 73–74, 78–79, 88.  Again and again, Coequyt defied the instructions of Casino staff and the officers.  At the Casino, Coequyt tried to wheel away from Holien, and he used his hands and feet to stop his wheelchair as Holien tried to wheel him out of the Casino.  Holien Rep. at 2; Hirichs Rep. at 2–3.  When they reached the squad car, Coequyt told Holien that he had "limited" mobility.  And when Holien tried to place Coequyt in his squad car, Coequyt

physically resisted, leading to what a reasonable officer could have perceived as an intentional kick to the officer's chest.

Even though Coequyt had stopped actively resisting by the time he arrived at the LEC, Coequyt continued to verbally abuse the officers and, in Holien's words, passively resist them. Holien Depo. at 23–24. Coequyt maintained an extremely argumentative and combative attitude throughout the night and repeatedly failed to comply with the officers' instructions. Moreover, Coequyt complained loudly—and unconvincingly—of pain just about every time an officer touched him, even when it was highly unlikely that the officer's touch was in fact causing him pain. In other words, Coequyt repeatedly "cried wolf," giving reasonable officers a basis for being skeptical of Coequyt's later complaints about being in pain.

A jury could also conclude that a reasonable officer in Holien's and Salvati's positions could have believed that Coequyt had the ability to support himself with his legs. As noted, Coequyt used his legs to interfere with Holien's attempt to wheel him out of the Casino. Before transporting Coequyt to the LEC, Holien asked him whether he had limited or no mobility, and Coequyt answered that his mobility was "limited," which a reasonable officer could have understood to mean that Coequyt was able to support himself with his legs. Holien observed Coequyt use his legs to stand up from his wheelchair, with the assistance of Holien and a Casino staff member. And just a few

minutes later, Coequyt appeared to kick Holien in the chest as Holien was attempting to place him in the backseat of the squad car.

After they arrived at the LEC, Holien told Cady and Salvati that Coequyt had "limited mobility, so he can do some things on his own."  Even though Holien later clarified that he had not seen Coequyt walk, he reiterated his belief that Coequyt could "use his legs" when he told Salvati and Cady that Coequyt had kicked him in the chest when he was placing him in the car.  Coequyt continually yelled that he could not walk, but the officers had reason to doubt Coequyt's veracity; he was extremely intoxicated and belligerent, and he was "crying wolf" about the pain he was experiencing.  Under the circumstances, the officers could reasonably rely on Holien's experiences, and reasonably discount Coequyt's protests, to reach the conclusion that Coequyt could support himself with his legs.

Based on Coequyt's belligerence and the fact that he had intentionally kicked Holien, a jury could find that Holien reasonably believed that Coequyt posed a safety risk to himself and others at the LEC.  Coequyt continued to passively resist arrest by failing to comply with Holien's and Salvati's instructions to sit up, support himself with his legs (which they reasonably believed he could do), and stop leaning forward.  The officers had to keep their hands on Coequyt to keep him from falling out of the chair. Accordingly, a jury could find that Holien and Salvati reasonably decided to place

Coequyt in a secure holding cell so that they could return to their duties, rather than

spend the night babysitting an intoxicated, combative, and unpredictable arrestee in the

sally port.

A jury could also believe the officers' testimony that they *did* consider

alternatives to carrying Coequyt—including retrieving his wheelchair from the Casino

and using the jail's restraint chair—but ruled out those alternatives for various reasons.

A jury could agree with Holien and Salvati that carrying Coequyt was the quickest and

easiest—and, most importantly, most reasonable—way of getting him to a holding cell.

Finally, a jury could find that when Holien and Salvati picked Coequyt up, they

reasonably believed that he had at least some use of his legs, and they reasonably

interpreted his failure to support himself as a conscious refusal to do so. Salvati Depo.

at 73 ("I believed that with our support, that [Coequyt] could have assisted in

supporting his weight . . . He refused to assist us."). *Cf. Wertish v. Krueger*, 433 F.3d

1062, 1066–67 (8th Cir. 2006) (record did not support an excessive-force claim where

officers were not aware that plaintiff was suffering from a diabetic episode, officers

observed plaintiff driving erratically and dangerously, and plaintiff was passively

resistant to officers' efforts to remove him from his truck). Holien testified that he

believed that the method they used to carry Coequyt was "commonly used" by law-

enforcement officers. Holien Depo. at 110–111. Moreover, according to Holien and

Salvati, they did not believe that they *were* causing Coequyt pain because he had been yelling at them and complaining constantly throughout the night.  *See id.* at 114–115; Salvati Depo. at 75–76.  As already noted, a jury could find that Coequyt had "cried wolf" during the evening, and that Holien and Salvati acted reasonably (even if mistakenly) in concluding that Coequyt was grossly exaggerating his pain.

Keeping in mind that excessive-force claims are assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Hosea v. City of St. Paul*, 867 F.3d 949, 957 (8th Cir. 2017) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)), if the jury resolves all factual disputes in favor of Holien and Salvati, this Court would conclude that the two officers did not use excessive force.

\*   \*   \*

In sum, then, whether Holien and Salvati are entitled to qualified immunity—or whether instead they are liable to Coequyt—depends entirely on how the jury resolves a number of disputes of fact.  For that reason, the Court denies the parties' cross-motions for summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

-29-

1.      Defendants' motions for summary judgment [ECF Nos. 41 and 48] are

        DENIED.

2.      Plaintiff's motion for partial summary judgment [ECF No. 55] is DENIED.

Dated:  August 11, 2022                 s/Patrick J. Schiltz
                                        Patrick J. Schiltz
                                        United States District Judge